NO. 07-05-0456-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL E



MARCH 19, 2007


 ______________________________



BENNY P. PHILLIPS, M.D., APPELLANT



V.



DALE BRAMLETT, INDIVIDUALLY, AND AS INDEPENDENT


ADMINISTRATOR OF THE ESTATE OF VICKI BRAMLETT, DECEASED;


SHANE FULLER AND MICHAEL FULLER, APPELLEES


_________________________________



FROM THE 237TH DISTRICT COURT OF LUBBOCK COUNTY;



NO. 2003-522,183; HONORABLE SAM MEDINA, JUDGE


_______________________________




Before CAMPBELL and HANCOCK, JJ. and REAVIS, S.J. (1)

OPINION


 Appellant, Benny P. Phillips, M.D., appeals from a jury verdict and subsequent
judgment in favor of appellees, Dale Bramlett, individually and as independent
administrator of the estate of Vicki Bramlett, Shane Fuller, and Michael Fuller (collectively,
"Bramlett"), in their medical malpractice action. Phillips presents six issues contesting the
judgment: 1) the evidence was legally or factually insufficient to support a judgment that
Phillips proximately caused the death of Vicki Bramlett, 2) Bramlett's jury argument was
improper and harmed Phillips, 3) the trial court failed to properly apply the statutory cap on
damages in a medical malpractice action, see Tex. Rev. Civ. Stat. Ann. art. 4590i, §
11.02(a) (Vernon Supp. 2001), (2) 4) the evidence was legally or factually insufficient to
support a finding of gross negligence, 5) the evidence was factually insufficient to support
certain of the damages awarded by the jury, and 6) the award of punitive damages
exceeds the limits set by Tex. Civ. Prac. & Rem. Code Ann. § 41.008 (Vernon Supp. 2006).

Factual Background


 Phillips is a gynecologic oncologist who performed a laproscopic-assisted vaginal
hysterectomy on Vicki Bramlett, on October 29, 2002. The procedure appeared to have
been successful and Vicki was returned to her hospital room. At approximately 5:30 p.m.,
Phillips was notified that Vicki, although otherwise stable, had produced only 50 cc of urine. 
A low urine output symptom could indicate internal bleeding or dehydration. Phillips
ordered that Vicki's blood be tested for hemoglobin and hematocrit levels (H&H test) "stat"
(immediately) and that she be given 500 cc of I.V. fluids over a 30 to 60 minute period (fluid
challenge). The results of these tests were to be called in to his office. While the tests
were being performed and read, Phillips assisted another physician in surgical procedures
at the same hospital.

 While Phillips was assisting in these surgeries, the results of Vicki's tests were given
to his office, who relayed them to the voice mail on Phillips's cell phone. The test results
revealed that Vicki's hemoglobin had dropped from a preoperative level of 15.7 to 9.8 and
that her urine output had not changed. Following the completion of the last surgery,
Phillips left the hospital without retrieving the voice mail from his cell phone, checking on
Vicki's status, or otherwise determining the results of the ordered tests. Phillips proceeded
to a previously scheduled cardiac workout with a trainer at a local gym. Upon arriving at
the gym, Phillips received an urgent message that Vicki's condition had deteriorated and
had become critical. Phillips rushed back to the hospital and ordered that Vicki be taken
to the operating room. During surgery, Phillips discovered a massive amount of blood in
Vicki's lower abdomen and pelvis. Despite attempts at resuscitation, Vicki suffered
aspiration pneumonia, brain damage, and organ failure. Four days later, on November 2,
2002, Vicki died from complications due to postoperative bleeding.

Procedural Background


 Dale Bramlett and Vicki's two sons, Shane and Michael Fuller, filed suit for wrongful
death against Phillips and Covenant Hospital. Prior to trial, Covenant settled Bramlett's
claims for $2,300,000 and was dismissed from the case. The remaining action against
Phillips went to trial and the jury returned a verdict in favor of Bramlett. The jury's verdict
included a finding that Phillips had been grossly negligent. Further, the jury was required
to proportion the negligence between Phillips and Covenant and the jury assessed Phillips
75 percent responsible for Vicki's death. The jury then awarded Bramlett $11,000,000 in
actual damages and $3,000,000 in punitive damages. Phillips filed a motion to disregard
certain jury findings and a motion for judgment notwithstanding the verdict. The trial court
overruled each of these motions. Judgment was subsequently entered awarding Bramlett
$9,196,364.50 in actual damages and $2,972,000 in punitive damages. (3) Following the
court's entry of judgment, Phillips filed a Motion to Correct, Modify or Reform Judgment
and a Motion for New Trial. The trial court overruled each post-judgment motion and
Phillips filed notice of appeal.

 By six issues, Phillips challenges the legal and factual sufficiency of the evidence
to support the jury's finding on the issue of causation, whether the jury argument made by
Bramlett's attorney was improper, the refusal of the trial court to apply the statutory
damage caps to the judgment, the sufficiency of the evidence to support the jury's finding
that Phillips was grossly negligent, the factual sufficiency of the evidence to support the
jury's award of damages, and whether the punitive damages award exceeded the limits set
by Tex. Civ. Prac. & Rem. Code Ann. § 41.008 (Vernon Supp. 2006). We will affirm in part,
suggest a remittitur in part, and reverse and render in part.

Legal and Factual Sufficiency of the Evidence Regarding Proximate Cause


 Phillips initially contends that the evidence was not legally or factually sufficient to
support the jury's finding that his negligence proximately caused the death of Vicki. When
both the legal and factual sufficiency of the evidence are challenged, we will first review the
legal sufficiency of the evidence. Glover v. Tex. Gen. Indem. Co., 619 S.W.2d 400, 401
(Tex. 1981). 

 When addressing legal sufficiency, the reviewing court must ultimately determine
whether the evidence at trial would enable reasonable and fair-minded jurors to reach the
verdict under review. City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). The
scope of the review requires consideration of all of the evidence, giving deference to
evidence favorable to the verdict if reasonable and fair-minded jurors could and
disregarding evidence contrary or unfavorable to the verdict unless reasonable and fair-minded jurors could not. Id. Phillips's primary contention concerns the proof of proximate
cause.

 As this is a medical malpractice case, Bramlett had to prove that the negligence of
Phillips proximately caused the death of Vicki within a reasonable medical probability. See
Duff v. Yelin, 751 S.W.2d 175, 176 (Tex. 1988). Proximate cause is made up of both cause
in fact and foreseeability. W. Invs., Inc. v. Urena, 162 S.W.3d 547, 551 (Tex. 2005). 
Specifically, it is as to the cause in fact element that Phillips posits the evidence is legally
insufficient. Phillips correctly points out that cause in fact requires that Bramlett prove that
the negligence of Phillips was a substantial factor in bringing about Vicki's death and without
such negligence Vicki would have survived. Park Place Hosp. v. Estate of Milo, 909 S.W.2d
508, 511 (Tex. 1995). Phillips's ultimate contention is that the evidence of cause in fact was
nothing more than the bare opinion of the expert without an identification of the causal
connection and is, therefore, no evidence of cause in fact. Archer v. Warren, 118 S.W.3d
779, 782 (Tex.App.-Amarillo 2003, no pet.). In order to properly analyze Phillips's
contention, a more detailed review of the procedural setting and evidence adduced at trial
is required.

 Bramlett proceeded to trial on the basis of their Fourth Amended Petition, which
provided, in pertinent part, that Phillips was guilty of negligence by: 1) failing to provide
appropriate and proper care; 2) failing to adequately assess Vicki's medical condition; and
3) failing to provide treatment in accordance with the applicable standard of care. To prove
Phillips's negligence and that it proximately caused Vicki's death, Bramlett offered the
testimony of David Hemsell, M.D., as an expert in the medical specialty of obstetrics and
gynecology. 

 Dr. Hemsell opined that Phillips's ordering of the H & H test (stat) was appropriate,
especially where Phillips was concerned that Vicki might be suffering internal bleeding post-operatively. Where the expert faulted Phillips was in not following up on the test. Dr.
Hemsell testified that the responsibility to determine the cause of Vicki's low urine output
and whether it was due to post-operative bleeding was the treating physician's. Further, Dr.
Hemsell testified that the nurses could not give more fluids or blood to Vicki or take her 
back for further surgery without orders to do so from the treating physician. It was Dr.
Hemsell's expert opinion that Phillips was negligent in not checking his voice mail before
leaving the hospital, inquiring into the results of the tests he had previously ordered for a
possible medical condition that he was professionally concerned about, or going to the
patient's room and confirming the clinical status of the patient. Dr. Hemsell further testified
that he had never heard of nor read about a patient bleeding to death after a laproscopic-assisted vaginal hysterectomy. Additionally, Dr. Hemsell testified that had Phillips gone to
the bedside of Vicki after finishing his last surgery, Vicki would probably be alive today. 

 In addition to the testimony of Dr. Hemsell, Phillips's expert, Dr. Diana Contreras,
testified that Vicki's death was due to negligence. Further, Dr. Contreras testified that had
Phillips gone to Vicki's bedside and given her the care and treatment that she needed, she
would be alive today. Finally, Dr. Contreras agreed that Phillips was the only person who
could have ordered additional I.V. fluids or a blood transfusion or to have Vicki taken back
to surgery. 

 Phillips's partner, Dr. William Edward Richards, testified, as a treating expert, that
when he first observed Vicki, at 7:45 p.m. on the day of surgery, she was suffering from
hypovolemic shock. Dr. Richards testified that the hypovolemic shock appeared to be the
result of the patient bleeding most of her blood out of her veins and into her abdomen or
pelvic area. Dr. Richards also testified that, considering the facts known to Phillips and the
pending H&H test and fluid challenge, Phillips should have checked his voice mail before
leaving the hospital. Dr. Richards testified that a reasonably prudent physician in Phillips's
position would have checked his voice mail prior to leaving the hospital.

 Phillips testified that one of his concerns when he ordered the H&H test was the
possibility that Vicki was suffering from post-operative bleeding. Phillips admitted that his
office had phoned the results of the H&H test to his cell phone's voice mail while he was
assisting in his last surgery of the day. He further admitted that he never checked his voice
mail prior to leaving the hospital. In at least two places in the trial court record, Phillips
affirmatively responded to a question from counsel that "[i]f [he] would have checked [his]
voice mail, [he] would have stayed at the hospital . . . ." Phillips also admitted that, had he
gone to Vicki's room to check on her clinical condition after finishing his last surgery, she
would probably be alive today. Phillips testified that a reasonable and prudent doctor would
have gone to check on Vicki if he had any knowledge that her clinical condition had
deteriorated, but Phillips denied having received the H&H test results prior to his arrival at
the gym. Throughout the trial, Phillips contended that the reason Vicki died was because
the nurses at the hospital did not keep him properly apprised of her clinical condition. 

 However, the emergency steps taken by Phillips when he returned to the hospital
were, in total, almost the same as outlined by Bramlett's expert as steps that the nurses
could not have taken without the orders of a physician. In the absence of the physician,
these steps could not be taken.

 In reviewing the total record, we note that much of the testimony relied upon by
Bramlett to support their position that the evidence was legally sufficient came by way of
cross-examination of the various witnesses. In nearly all of these situations, the witnesses
were impeached with prior deposition testimony. Thus, the jury's ultimate resolution of the
apparently conflicting testimony resulted in a factual finding adverse to Phillips.

 Phillips's legal sufficiency challenge is grounded upon his perception that the
evidence presented by Dr. Hemsell was, at best, conclusory on the issue of cause in fact. 
The cases cited by Phillips point out that Bramlett was required to offer competent expert
testimony (4) that proved: 


 the standard of care that Phillips should have used in his post-operative
treatment of Vicki;
 what action of Phillips breached that standard of care;
 the injury suffered by Vicki; and
 a causal connection between the breach of the standard of care and the
injury suffered.


 

See Moreno v. M.V., 169 S.W.3d 416, 420 (Tex.App.-El Paso 2005, no pet.); Blan v. Ali,
7 S.W.3d 741, 744 (Tex.App.-Houston [14th Dist.] 1999, no pet.).

 The testimony of Dr. Hemsell, as previously outlined, demonstrated that he thought
Phillips's ordering of the H&H test was appropriate for a post-operative patient who was
demonstrating low urine output. However, Dr. Hemsell opined that Phillips breached the
standard of care when he did not follow up on the H&H test, especially when he was
concerned that the patient might be suffering from post-operative bleeding. Specifically,
the lack of any action by Phillips to determine the results of the test, in order to confirm or
contradict that the patient was suffering from post-operative bleeding, was a breach of the
standard of care. In discussing the breach of the standard of care, Dr. Hemsell was
adamant that Phillips should not have left the hospital without checking his voice mail,
especially as the cell phone was one of the ways Phillips had ordered his staff to
communicate with him. In lieu of checking his voice mail, Dr. Hemsell stated that Phillips
should have either contacted the hospital directly about the test results or gone by the
patient's room to determine her then-existing clinical condition. The injury suffered by
Vicki, as a result of Phillips's inaction, was that she lapsed into hypovolemic shock due to
loss of blood and subsequently died. Dr. Hemsell testified that he had never heard of or
read about a patient who had bled to death following a laproscopic-assisted vaginal
hysterectomy. Dr. Hemsell concluded that only the physician, Phillips, could order
additional fluids, blood transfusion, or further surgery. Accordingly, it was Dr. Hemsell's
opinion that the failure to accurately maintain awareness of the clinical condition of the
patient was negligence on the part of Phillips and that this negligence was the proximate
cause of Vicki suffering hypovolemic shock which resulted in her death.

 Additionally, other experts testified during the trial regarding the standard of care,
breach, injury, and causation. Both Dr. Contreras and Dr. Richards initially testified in a
manner that supported Phillips's primary defensive theory, that the negligence of the
nurses at the hospital was the primary cause of the injury suffered by Vicki. However,
during cross-examination, both testified that, had Phillips gone to the bedside of Vicki
before leaving the hospital and given her the treatment required, she would be alive today. 
When asked about who could order the necessary treatment for Vicki, Dr. Contreras
testified that only the doctor could order additional I.V. fluids, blood transfusion, or order
that the patient be taken back for a subsequent surgery. Dr. Richards testified that, when
he observed Vicki at 7:45, she was suffering from hypovolemic shock and that she had,
in fact, bled most of her blood out of her veins and into her abdomen or pelvic areas. The
testimony of these witnesses was equally available to the trier of fact in determining the
ultimate issue of whose negligence proximately caused the death of Vicki. In a multiple
expert case, such as this one, each expert's testimony on the possible causes of death is
appropriate to assist the jury in reaching its ultimate decision. Hooper v. Chittaiuru, No. 14-05-00058-CV, 2006 WL 1766002, at *7 n.4 (Tex.App.-Houston [14th Dist.] 2006, pet. filed)
(op. on reh'g.). In conducting our legal sufficiency review, we also must consider this
testimony. City of Keller, 168 S.W.3d at 827.

 Finally, the testimony of Phillips must be considered. During cross-examination,
Phillips admitted that, had he gone to the bedside of Vicki and evaluated her clinical
condition, she would be alive today. Further, he admitted that, had he checked his voice
mail, he would have stayed at the hospital. Bramlett posits that this testimony amounts to
judicial admissions and, therefore, conclusively proves Phillips's negligence. Phillips's
admissions are quasi-admissions, which are not conclusive. Mendoza v. Fidelity & Guar.
Ins. Underwriters, Inc., 606 S.W.2d 692, 694 (Tex. 1980). However, a quasi-admission will
be treated as a judicial admission if it appears that:


 the declaration relied upon was made during the course of a judicial
proceeding;
 the statement is contrary to an essential fact embraced in the theory of
recovery or defense asserted by the party giving the testimony;
 the statement is deliberate, clear, and unequivocal, thereby, eliminating
the hypothesis of mere mistake or slip of the tongue;
 giving conclusive effect to the declaration will be consistent with the
public policy upon which the rule is based; and
 the statement is not destructive of the opposing party's theory of
recovery.


 

Griffin v. Superior Ins. Co., 161 Tex. 195, 338 S.W.2d 415, 419 (1960). 


 Considering Phillips's admissions in light of these factors, there can be no question
that the testimony of Phillips was made during a judicial proceeding. It is further beyond
question that Phillips's position was that he committed no act of negligence in the
treatment of Vicki, rather that it was the hospital's nurses that acted negligently. 
Accordingly, Phillips's admissions that, had he checked his voice mail, he would have
stayed at the hospital and Vicki would be alive today, runs contrary to an essential fact of
Phillips's defensive theory. Phillips made these admissions on two separate occasions
during cross-examination, thereby, eliminating the slip of the tongue or mistake hypothesis. 
Giving conclusive effect to these declarations is consistent with the public policy that it
would be unjust to allow a party to rely on one factual defense at trial and then, after the
trier of fact found against him, to argue a different factual defense on appeal. Finally, there
is nothing about these quasi-admissions that is destructive of Bramlett's position. We,
therefore, conclude that the quasi-admissions of Phillips should be treated as judicial
admissions on the question of negligence and cause in fact of the death of Vicki. Id.

 When this testimony is reviewed to determine whether reasonable and fair-minded
jurors could find that Phillips's negligence was the proximate cause of Vicki's death, we are
convinced that the evidence was legally sufficient to sustain the jury's verdict. City of
Keller, 168 S.W.3d at 827. Having concluded that the evidence was legally sufficient to
support the verdict, we must next turn our attention to the issue of the factual sufficiency
of the evidence. 

 In reviewing a factual sufficiency challenge, we must again review all of the
evidence. See Lofton v. Tex. Brine Corp., 720 S.W.2d 804, 805 (Tex. 1986). However,
in a factual sufficiency review, deference is not given to evidence favorable to the verdict
and contrary evidence is not disregarded. Rather, we will reverse a verdict on the basis
of factual insufficiency only if the verdict is so against the great weight and preponderance
of the evidence that it is manifestly erroneous or unjust. See In re King's Estate, 150 Tex.
662, 244 S.W.2d 660, 661 (1951). 

 Having heretofore reviewed all of the evidence for purposes of the legal sufficiency
challenge, we note that the evidence that is contrary to the jury verdict centered on the
activity of the hospital nurses, specifically whether the nurses failed to keep Phillips
properly apprised of Vicki's clinical condition. The record reflects that all experts, including
Phillips, testified that, if Phillips had followed up on the test results, Vicki would have lived. 
None of these experts indicated that the nurses unduly delayed reporting the test results. 
There was some conflicting testimony about the recording of Vicki's vital signs and whether
the hospital staff took the vital signs as ordered. However, the trier of fact heard this
evidence and resolved the conflict when they apportioned responsibility 75 percent to
Phillips and 25 percent to the hospital. After reviewing all of the evidence, we cannot say
that the jury's finding was so against the great weight and preponderance of the evidence
as to be manifestly erroneous or unjust. Id. Therefore, we find the evidence factually
sufficient to sustain the jury's verdict. Having determined that the evidence was legally and
factually sufficient, we overrule Phillips's first issue.



Improper Jury Argument

 Phillips next contends that Bramlett made an improper jury argument that resulted
in harm to Phillips and that requires reversal. Phillips posits that Bramlett's argument that
the jury needed to send a message to the doctors of Lubbock County by awarding a
substantial sum of money in damages was improper and reversible. In analyzing an
allegation of improper jury argument we begin by noting that, to obtain a reversal based
upon alleged improper jury argument, Phillips must prove the existence of:


 improper argument;


2) that was not invited or provoked;

3) that was preserved by the proper trial predicate; and


 if no objection made or if objection made and sustained, that was
incurable; or 
 if timely and proper objection overruled by trial court, that was by its
nature, degree, and extent harmful reversible error. 



Standard Fire Ins. Co. v. Reese, 584 S.W.2d 835, 839 (Tex. 1979); Melendez v. Exxon
Corp., 998 S.W.2d 266, 280 (Tex.App.-Houston [14th Dist.] 1999, no pet.). See generally 
4 Roy W. McDonald, et al., Texas Civil Practice § 23:23-24 (2nd ed. 2001).

 For the purpose of discussing the contentions of Phillips, we will assume, without
deciding, that the argument complained of was improper. There is nothing to suggest that
the argument in question was invited or provoked. Rather, Phillips contends that the error
was preserved at trial and, if not, was an incurable jury argument that was preserved by
his motion for new trial. In addressing the issue of preservation of error, we note that the
first instance of the alleged improper argument occurred very early in the opening of
Bramlett's final argument. Counsel stated, "For years, in this very conservative community,
juries have been very liberal with the doctors, very liberal. What I mean is: Their verdicts
didn't send much of a message at all." Immediately, Phillips's counsel voiced the following
objection, "Judge, I object to any testimony about the propriety of other trials and the 
verdicts reached by other juries in Lubbock." To which, the trial court responded, "This is
his argument, and it is not testimony." Subsequently, Bramlett's counsel repeatedly argued
that the jury needed to send a message to the doctors of Lubbock. However, on none of
these occasions did Phillips object. It is from this record that we must determine whether
or not Phillips has preserved error. Texas Rule of Appellate Procedure 33.1(a)(1)(A)
requires, to preserve an allegation of error for appellate review, the record must show a
timely objection stating the grounds for the requested ruling with enough specificity to make
the trial court aware of the complaint, unless the specific grounds were apparent from the
context. Tex. R. App. P. 33.1(a)(1)(A). From the language used in the objection and the
response of the trial court, it is apparent that the trial court did not perceive the objection
to be directed toward improper jury argument. Rather, the record reflects that the trial court
simply clarified that the statement was not evidentiary. Nor can we say that the context of
the objection makes the specific grounds now complained of clear. Id. Additionally, the
trial court never sustained or overruled the objection. To preserve a complaint for appeal,
the complaining party is required to obtain an adverse ruling from the court or object to the
trial court's refusal to rule. Tex. R. App. P 33.1(a)(2); See Cherry v. Lee, 899 S.W.2d 329,
331 (Tex.App.- Houston [14th Dist.] 1995, no writ). We have, therefore, determined that
the error alleged was not preserved at trial pursuant to the Texas Rules of Appellate
Procedure. See Tex. R. App. P. 33.1(a).

 However, this does not end our inquiry. In his motion for new trial, Phillips alleged
that Bramlett's jury argument was incurable. As a result, we must determine whether this
jury argument was incurable and, therefore, was preserved by Phillips raising the issue in
his motion for new trial. Tex. R. Civ. P. 324(b)(5); Otis Elevator Co. v. Wood, 436 S.W.2d
324, 333 (Tex. 1968). Initially, we note that it is a rarity for jury argument to be so
inflammatory or prejudicial as to be classified as "incurable." Standard Fire Ins. Co., 584
S.W.2d at 839. To properly determine whether a complained of jury argument is incurable,
we must review the entire case from voir dire to the conclusion of final argument. Id. at
840. Ultimately, we are attempting to determine whether the probability that the improper
jury argument caused harm is greater than the probability that the verdict was grounded
on proper proceedings and evidence. Id. The type of argument that reaches this level is
one that is so inflammatory that its harmful nature cannot be cured by an instruction to
disregard. Melendez, 998 S.W.2d at 280. After reviewing the various authorities cited by
Phillips, it is apparent that cases reversing judgments for incurable jury argument fall into
the category of arguments that resort to name calling, epithets, racial slurs, and attacks
upon opposing counsel of a personal and extreme nature. See S. Pac. Co. v. Hubbard,
156 Tex. 525, 297 S.W.2d 120, 125 (1956) (plaintiff's attorney argued that the railroad
accused anyone who sued it of being a thief and liar); Tex. Employers' Ins. Ass'n v.
Haywood, 153 Tex. 242, 266 S.W.2d 856, 858-89 (1953) (counsel urged jury not to believe
two witnesses because they were not white); Sw. Greyhound Lines v. Dickson, 149 Tex.
599, 236 S.W.2d 115, 120 (1951) (counsel accused physician witness of being motivated
by a desire "for whittling flesh" and of employing the same care as a fisherman had for
"cutting the guts out" of fish); Circle Y of Yoakum v. Blevens, 826 S.W.2d 753, 757
(Tex.App.-Texarkana 1992, writ denied) (counsel accused opposing counsel of
manufacturing evidence).

 In the instant case, the record reflects that the first mention of the "send a message"
theme was made pre-trial during discussions regarding the motions in limine and possible
jury questions. Subsequently, during voir dire, there was a general discussion by
Bramlett's counsel to the effect that the jury was going to be asked to send a message
about what kind of conduct by physicians would and would not be tolerated in Lubbock
County. Later, there was one reference to what other juries in Lubbock County had done
in other medical malpractice cases. Phillips timely objected, the objection was sustained,
and counsel for Bramlett was instructed to rephrase his question, which he did. During
opening statements, counsel for Bramlett made references to the fact that Bramlett would
be asking the jury to send a message to doctors in Lubbock about what was and was not
acceptable conduct. Phillips objected that the opening statement was more in the nature
of closing argument, which the court sustained. During presentation of evidence, there
was one question regarding sending a message. During final arguments, there were
several references to sending a message. However, in each instance, the refrain from
Bramlett's counsel was in connection with the evidence and what the community should
tolerate as a standard for proper medical care. Thus framed, we cannot say that the
argument was one that appealed only to the prejudices of the jury or was so inflammatory
as to override the jury's collective ability to review the evidence and base a verdict on the
evidence. Standard Fire Ins. Co., 584 S.W.2d at 840. Thus, because we conclude that
Bramlett's "send a message" jury argument was not incurable, Phillips waived any error by
failing to properly object and obtain a ruling at trial. Tex. R. App. P. 33.1; Standard Fire Ins.
Co., 584 S.W.2d at 839. Further, even if the argument had been properly preserved, after
reviewing the evidence, we cannot say that the probability that the alleged improper jury
argument was harmful is greater than the probability that the verdict was grounded in the
evidence adduced at trial. Standard Fire Ins. Co., 584 S.W.2d at 840. Accordingly,
Phillips's issue regarding Bramlett's closing argument is overruled.

Factual Sufficiency of Damage Issues


 Phillips next contends that the evidence was factually insufficient to support the
award of damages for: 1) conscious pain and suffering, 2) pecuniary loss, 3) loss of
companionship and society, and 4) mental anguish. As this is an allegation of factual
insufficiency regarding an issue upon which Bramlett had the burden of proof, we will
review all of the evidence to determine if it is "so weak, or the contrary evidence so
overwhelming, as to render the finding clearly wrong or manifestly unjust." Lee Lewis
Constr., Inc v. Harrison, 64 S.W.3d 1, 6 (Tex.App.-Amarillo 1999), aff'd 70 S.W.3d 778
(Tex. 2001). In our review for factual sufficiency, it is presumed that the jury considered
all of the available evidence. Mo. Pac. R.R. Co. v. Roberson, 25 S.W.3d 251, 257
(Tex.App.-Beaumont 2000, no pet.). We must also remember that the jury is the sole
judge of the credibility of the witnesses and the weight to be given their testimony. Killion
v. Lanehart, 154 S.W.3d 183, 191 (Tex.App.-Amarillo 2004, pet. denied).

Conscious pain and suffering

 First, we address the issue of damages for Vicki's pain and suffering. Phillips posits
that since he would only have been able to return the phone call regarding Vicki's test
results after he left the last surgery, which was at approximately 7:16 p.m., that represents
the earliest point at which he would have been able to treat Vicki's deteriorating condition. 
Further, when Vicki was seen by Phillips's partner, Dr. Richards, at 7:45 p.m., she was
incoherent and never regained consciousness. Therefore, Phillips contends that the only
applicable time for calculation of Vicki's conscious pain and suffering is approximately 29
minutes. 

 However, the record reflects that at times during the post-operative period,
especially after approximately 5:30 p.m., Vicki was beginning to exhibit symptoms of post-operative bleeding. Specifically, she became agitated and confused, she vomited and
began feeling a need to go to the bathroom, and she appeared to be having some difficulty
breathing. During this time, however, the nurses reported that Vicki's vital signs were
stable. According to Phillips's witness, Dr. Richards, when he saw Vicki at 7:45 p.m., she
was suffering from hypovolemic shock, because she had bled most of her blood out into
her abdomen or pelvic area. No evidence was presented as to how long it would take for
a person to bleed to death, however, the medical evidence adduced from the second
surgery revealed that there were no sources for the bleeding consistent with rapid loss of
blood. Considering all of this information, it would not be irrational for the jury to infer that
Vicki was aware of her impending death. When a decedent is aware of their impending
death, it is appropriate for the jury to consider that fact in evaluating mental suffering. 
Jenkins v. Hennigan, 298 S.W.2d 905, 911 (Tex.Civ.App.-Beaumont 1957, writ ref'd
n.r.e.). Additionally, the jury had evidence before them indicating that Vicki took agonal
breaths before she lapsed into unconsciousness, clearly indicating that Vicki was suffering
pain at the time. There is some conflict in the evidence regarding when Vicki lapsed into
unconsciousness, however, it was for the jury to resolve that conflict, see McGalliard v.
Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986), and we cannot say that the jury's resolution
of this conflict against Phillips is one that would be clearly wrong or manifestly unjust. Lee
Lewis Constr. Inc., 64 S.W.3d at 6. Further, even if the jury believed Phillips's contention
that Vicki was only conscious for a thirty minute period, we find the evidence of the pain
that she suffered during this period, together with her awareness of her impending death,
sufficient to support the jury's verdict. Accordingly, we find the evidence factually sufficient
to sustain the jury's award of $1,000,000 for Vicki's pain and suffering.

Pecuniary loss

 Next, we address Phillips's contention that the evidence supporting the award of
pecuniary damages was factually insufficient. The jury awarded pecuniary damages to
Vicki's husband, Dale, in an amount of $33,000 for past loss and $500,000 for future loss
and to each of Vicki's sons, Shane and Michael, in the amount of $33,000 for past loss and
$250,000 for future loss. 

 The elements of pecuniary damages consist of more than just the lost earning
capacity of the decedent. See Best Steel Bldgs., Inc. v. Hardin, 553 S.W.2d 122, 133
(Tex.Civ.App.-Tyler 1977, writ ref'd n.r.e.). Additionally, pecuniary loss includes the value
of the advice, counsel, services, care, maintenance, and support of the deceased. Moore
v. Lillebo, 722 S.W.2d 683, 687 (Tex. 1986). Although the fact finder is not limited to
computation of pecuniary loss based upon the projection of the decedent's future earnings,
it is the basic and, some would say, primary element of such an award. Moorehead v.
Mitsubishi Aircraft Int'l, 828 F.2d 278, 290 (5th Cir. 1987). Thus, to assess the factual
sufficiency of the evidence supporting the jury's award for pecuniary damages, we must
consider both the economic and emotional injury suffered by Bramlett as a result of Vicki's
death. See generally Lee Lewis Constr., Inc., 64 S.W.3d at 6.

 Turning our attention first to the award to Dale, the record reflects that Vicki and
Dale were fully engaged as partners within the household. There is testimony about the
amount of money that Vicki was making at the time of her death and what her earnings
would have been during the balance of her work life. The evidence supports past lost
earnings of $64,867 and future lost earnings of $472,499. Moreover, there was
considerable testimony about the work that Vicki performed in the home on a day-to-day
basis. Evidence shows that Vicki did the cooking, cleaning, purchasing, and laundry for
the family. Additionally, the evidence shows that Vicki was the money manager for the
family, bookkeeper for Dale's landscaping business, and family tax preparer. The record
reflects the approximate value of these services at $19,000 annually. Finally, we must
consider the loss of Vicki's advice and counsel. As stated in the testimony, Vicki kept
everything together and, without her, the house no longer felt like a home. When this
evidence is considered in light of the jury's award to Dale, we cannot say that the award
was clearly wrong or manifestly unjust. See id.

 Regarding the awards to Shane and Michael, the record reveals that, at the time of
Vicki's death, Michael was still a minor, while it appears that Shane may have reached his
majority. Both young men were of majority by the time of the trial. On the date of Vicki's
death, both of her sons were living at home with her. There was significant testimony
about the role she played in their daily lives. Most of this testimony concerned the advice,
counsel, services, care, maintenance and support that Vicki provided each of her sons. 
While both boys were living at home and attending school, it appears that neither worked
for anyone outside the home. There was some testimony about Vicki occasionally giving
unspecified sums of money to each of the boys. At some unspecified time after the death
of Vicki, but before the trial, Shane and Michael moved to Oregon. It is from this record
that we must make a determination of the factual sufficiency of the evidence to support the
jury's award of past and future pecuniary damages to Shane and Michael. 

 As to the award for past pecuniary damages, the evidence shows that both of Vicki's 
sons were still living at home at the time of Vicki's death. The boys had benefitted from the
advice and counsel of Vicki, as well as the household services she performed. 
Additionally, it appears that neither Shane nor Michael were required to work outside of the
home prior to Vicki's death. With these facts in mind, we cannot say that the award of past
pecuniary damages of $33,000 for each son was clearly wrong or manifestly unjust. See
Id.

 However, the award of future pecuniary damages of $250,000 appears excessive. 
Again, there was no evidence that Vicki made substantial or even routine financial
contributions to the boys. Further, the record reflects that Vicki's role as advisor and
counselor to the boys was decreasing as the boys were moving toward striking out on their
own. Without the financial contribution testimony, the award in question appears to be
clearly wrong and manifestly unjust and, therefore, factually insufficient. Id. However, the
record does support an award of some loss of future pecuniary damages. Accordingly, we
recommend that a remittitur is appropriate. We, therefore, suggest a remittitur of $220,000
for the future pecuniary loss award to each son. See Tex. R. App. P. 46.3.

Loss of companionship and society

 Phillips next contends that the evidence was factually insufficient to support the
jury's award for loss of companionship and society to each of the three beneficiaries. The
jury awarded Dale the sum of $1,265,000, apportioned $500,000 for past damages and
$765,000 for future damages. Michael and Shane each received an award of $2,250,000,
apportioned $500,000 for past damages and $1,750,000 for future damages. A review of
the Court's Charge reveals that the trial court properly charged the jury about the elements
of loss of companionship and society. The charge admonished the jury that loss of
companionship and society is different and distinct from damages for mental anguish and
that, when considering one, the jury should not include damages for the other. Lastly, the
jury was admonished not to let sympathy play any part in their deliberations. Moreover,
Phillips did not object to the charge as given.

 Phillips posits, in his brief, that "it seems apparent that the jury improperly
considered mental anguish" in making its loss of companionship and society award and he
further contends, in the alternative, that the jury based the award on sympathy for Bramlett
and to punish Phillips. However, these allegations are just that, for nowhere in the record
does Phillips point to anything that substantiates these contentions. He simply opines that
the size of the award must mean that the jury was improperly considering other matters. 
As stated above, the jury was properly charged as to each of the matters complained of. 
The issue of punishment for Phillips had been discussed since voir dire in the context of
punitive damages for gross negligence. The jury, in answers to other jury questions,
awarded a large sum to Bramlett for mental anguish and found that Phillips was grossly
negligent and made a separate award of punitive damages. Therefore, Phillips's true
complaint is that the loss of companionship and society award was large and, therefore,
was not supported by factually sufficient evidence. 

 The record reflects that Dale and Vicki enjoyed a harmonious relationship in which
each was a full partner in the marriage. While it is true that the work schedules of each left
little time for outside interests, the record demonstrates that Dale and Vicki spent their time
raising a family and furthering their collective goals. Vicki's efforts at maintaining a home,
despite a significant work schedule, along with providing bookkeeping services for Dale's 
landscaping business demonstrate that the marriage was a true partnership. Further, Dale
testified, since Vicki's death, his life had become empty. 

 The evidence regarding Michael and Shane was demonstrative of the significant
role that Vicki played in the lives of the boys. Although they were either at majority or
reaching majority shortly, both testified about what the loss of their mother meant to them. 
She was their personal mentor in all things. 

 When we apply this evidence to the charge, it is apparent that the relationship Dale,
Michael, and Shane had with Vicki was strong. All the family members were living in the
home at the time of Vicki's death, there were no extended absences by anyone from the
home, and they shared interests, most significantly, the lives of each other. Moore, 722
S.W.2d at 688. Additionally, we note that loss of companionship is meant to recompense
the surviving members of the family for the positive benefits that flowed to the family from
the decedent having been an integral part of it. Id. With these factors in mind, we cannot
say that the jury's award for loss of companionship and society was clearly wrong or
manifestly unjust. See Lee Lewis Constr. Inc., 64 S.W.3d at 6. The mere fact that an
award is large is not, in and of itself, indicative that passion, prejudice, or improper motive
on the part of the jury resulted in the verdict rendered. Mo. Pac. R.R. Co. v. Roberson, 25
S.W.3d 251, 257 (Tex.App.-Beaumont 2000, no pet.). After considering all of the
evidence, we cannot say that this award is so flagrantly outrageous, extravagant, and 
excessive that it shocks the judicial conscious. Cresthaven Nursing Residence v.
Freeman, 134 S.W.3d 214, 228 (Tex.App.-Amarillo 2003, no pet.). Accordingly, we
overrule Phillips's factual sufficiency challenge to the jury's award for loss of
companionship and society as to each survivor. 



Mental anguish 

 Phillips next contends that the evidence was factually insufficient to sustain the
jury's awards of $1,000,000 in mental anguish damages each to Dale, Michael, and Shane. 
The record reflects that the jury was properly charged about the meaning of mental
anguish and the factors that the jury could consider in determining the amount of these
damages. The jury was further admonished that mental anguish is separate and distinct
from loss of companionship and society and that it should not consider elements of one
in the other. Lastly, the jury was given the general admonition about refraining from basing
its decisions on bias, prejudice, or sympathy. As with the previous issue, Phillips did not
object to the charge as given. 

 Phillips has cited Saenz v. Fid. & Guar. Ins. Underwriters, 925 S.W.2d 607, 614
(Tex. 1996), for the proposition that mental anguish damages could not be awarded unless
there was direct evidence of the nature, duration, or severity of plaintiff's mental anguish,
thus establishing a substantial disruption in the plaintiff's daily routine. In Saenz, the Texas
Supreme Court noted that there were only two lines of testimony that could be construed
as evidence of mental anguish and that this evidence, at best, constituted proof of mere
worry, anxiety, vexation, embarrassment, or anger. Id. In the present case, our review of
the evidence leads us to conclude that there is direct evidence of the nature, duration, and
severity of Dale's, Michael's, and Shane's mental anguish.

 It is important to remember the surrounding circumstances that were present at the
time of Vicki's death in order to place her death in proper perspective. Vicki entered the
hospital for a laproscopic-assisted vaginal hysterectomy. All of the medical professionals
who testified, except Phillips, (5) stated that they had never heard of a patient bleeding to
death after such a procedure. Dale testified that, on October 29th, the day of the surgery,
he expected to have Vicki home shortly. He never considered the possibility that Vicki
could die as a result of the surgery. After the second surgery, when it became apparent
that nothing else could be done for Vicki, Dale had to get the family together to make the
decision about whether to unplug the life support equipment that was sustaining Vicki. As
a result of Vicki's death, Dale testified that he does not feel like he has a life and that he
is now just trying to survive. When asked how the house feels now, Dale related that it is
just empty. Although it had been three years since Vicki's death, Dale testified that the hurt
he feels is still the same. At the time of trial, Dale stated that, when he comes home he
still thinks he hears Vicki in the house, although he knows that cannot be so. 

 Michael and Shane testified about the sense of loss they each have. Each testified
that when their mother went to the hospital, she told them not to worry and that it was just
going to be for a short time. As a result of losing their mother, the boys moved to Oregon,
where Vicki's identical twin sister lives. Although the move had helped, it was not the
same. Michael and Shane both testified that they still talk about their mother almost every
day. Michael stated that he keeps a picture of his mother on his bedroom wall. Each
testified that the home was not the same after Vicki died and that this was a big reason that
they moved to Oregon. 

 Mental anguish represents the emotional pain, torment, and suffering experienced
as a result of the death of a family member. Moore, 722 S.W.2d at 688. Further, mental
anguish is meant to compensate the survivors for "their harrowing experience resulting
from the death of a loved one." Id. In determining mental anguish damages, the jury is
trying to determine the adverse effect the death has had upon the survivors. Id. 

 Based upon our review of the evidence, it is apparent that Dale, Michael, and Shane
each testified about the day-to-day effect that the death of Vicki has had upon them. It is
apparent that the survivors of Vicki have suffered more than mere worry, anxiety, vexation,
embarrassment, or anger. Parkway Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex. 1995);
Saenz, 985 S.W.2d at 614. Inasmuch as there is factually sufficient evidence to support
the award of mental anguish damages, it was up to the jury to determine the fair and
reasonable compensation for the loss involved. Saenz, 925 S.W.2d at 614. We cannot
say that the jury's award of $1,000,000 to each of the survivors was clearly wrong or
manifestly unjust. See Lee Lewis Constr. Inc., 64 S.W.3d at 6. Accordingly, Phillips's
challenge to the factual sufficiency of the mental anguish damages award is overruled.

 Having overruled all of Phillips's challenges to the factual sufficiency of the evidence
to support the award of the various damage elements, except for the award of future
pecuniary damages to Michael and Shane, we affirm the judgment's award of those
damages. In the case of the award for future pecuniary damages to Michael and Shane,
we suggest a remittitur of $220,000 for the award to both Michael and Shane. If the
remittitur is accepted, we overrule all of Phillips's contentions regarding the damages
awarded.

Failure to Apply Statutory Damage Caps


 Phillips next contends that the trial court committed reversible error by failing to
apply the damage caps of article 4590i, section 11.02, to the jury's award of non-economic
damages to Bramlett. According to Phillips, the correct application of the damage caps
would result in a reduction of the jury award from $9,196,364.50 in actual damages and
prejudgment interest to $1,585,365.85. After the return of the jury verdict, Phillips filed a
motion for judgment notwithstanding the verdict requesting that the trial court disregard the
jury findings and enter judgment consistent with the damage caps. The trial court denied
the motion and Phillips subsequently filed a motion to correct, modify, or reform the
judgment along with a motion for new trial requesting the same relief. Again, the trial court
denied the motions.

 The statute at issue in this matter is the Medical Liability and Insurance
Improvement Act, as passed by the 65th Legislature. Specifically, it is the meaning of
section 11.02(a) and (c) that this issue concerns. The applicable sections provide:

11.02 Limit on Civil Liability


 In an action on a health care liability claim where final judgment is
rendered against a physician or health care provider, the limit of civil
liability for damages of the physician or health care provider shall be
limited to an amount not to exceed $500,000.


* * *



 This section shall not limit the liability of any insurer where facts exist that
would enable a party to invoke the common law theory of recovery
commonly known in Texas as the "Stowers Doctrine."



art. 4590i, § 11.02(a),(c). 

 The "Stowers Doctrine" is a common law doctrine first enunciated in G.A. Stowers
Furniture Co. v. Am. Indem. Co., 15 S.W.2d 544 (Tex. Comm'n App. 1929, holdings
approved). The "Stowers Doctrine" permits an insured to maintain a cause of action
against his insurer for the negligent failure of the insurer to settle a claim within applicable
policy limits. Id. at 547-48. The elements of a "Stowers Doctrine" claim are (1) the claim
against the insured was within the scope of coverage, (2) there was a settlement demand
within policy limits, and (3) the terms of the demand were such that an ordinary prudent
insurer would have accepted, considering the likelihood and degree of the insured's
potential exposure to an excess judgment. Am. Physicians Ins. Exch. v. Garcia, 876
S.W.2d 842, 849 (Tex. 1994). 

 We review the proper application of the damage caps under a de novo standard of
review. This is so because we must construe the statute in question, which constitutes a
question of law. Tex. Dep't of Transp. v. Needham, 82 S.W.3d 314, 318 (Tex. 2002). Our
goal is to give effect to the legislative intent. See Tex. Gov't Code Ann. §§ 311.021,
311.023, 312.005 (Vernon 2005), (6) Kroger Co. v. Keng, 23 S.W.3d 347, 349 (Tex. 2000). 
In trying to arrive at the legislative intent, we first look to the plain and common meaning
of the words used. Sorokolift v. Rhodes, 889 S.W.2d 239, 241 (Tex. 1994). Further, we
must construe the statute as a whole, not its provisions in isolation. Cont'l Cas. Co. v.
Downs, 81 S.W.3d 803, 805 (Tex. 2002). Pursuant to statute, we may also look at other
matters, to help us determine the legislature's intent, such as: 1) the objective sought to
be obtained by the statute; 2) the circumstances under which the statute was enacted; 3)
the legislative history of the statute; 4) common law or former statutory provisions, including
laws on the same or similar subjects; 5) the consequences of a particular construction; 6)
any administrative constructions of the statute; and 7) the statute's title (caption),
preamble, and emergency provision. § 311.023. Finally, in applying the plain and common
meaning of the words, we are cautioned not to enlarge, by implication, the meaning of any
word beyond its ordinary meaning in a manner that would enlarge the meaning of the
statute. Sorokolift, 889 S.W.2d at 241.

 Phillips's position regarding the interpretation of the applicable section of the statute
is founded upon the opinion of the Second District Court of Appeals in Welch v. McLean,
191 S.W.3d 147 (Tex.App.-Fort Worth 2005, no pet.). The Welch court's opinion focused
on what it felt was the plain and common meaning of the phrase "this section shall not limit
the liability of any insurer" found in art. 4590i, section 11.02(c). Id. at 168. Under the
court's analysis, in its plain and common meaning the term "insurer" does not include a
physician. Id. Therefore, the court concluded that to hold that art. 4590i, section 11.02(c),
lifted the damage cap on physician liability established by section 11.02(a) would
impermissibly enlarge the meaning of the terms of the statute. Additionally, the Welch
court determined that the other terms used in art. 4590i, section 11.02(a), indicated that
the legislature never intended section 11.02(c) to impact the damage cap. Id. The court's
analysis keyed on the phrase, "in an action on a health care liability claim." Art. 4590i, §
11.02(a). The Welch court stated that, since a "health care liability claim" can only be
asserted against a physician or health care provider, an insurer can never be liable for a
patient's health care liability claim under the statute. Welch, 191 S.W.3d at 168. 
Therefore, the insurer's "Stowers" liability can only be owed to the insured physician. Id. 
Finally, the Welch court posits that to allow the construction of the statute urged by the
McLeans, appellants therein, would foster the absurd result that the physician would be
liable for the total amount of the judgment, without application of the caps, if his "Stowers"
action was unsuccessful on the merits. Id. at 171.

 Our review of the statute and utilization of the permissible aids to construction lead
us to a construction contrary to that reached by the Welch court. Initially, we note that the
Welch court did not attempt to construe the words, "This section . . ." at the beginning of
art. 4590i, section 11.02(c). To ascertain what the words "This section . . ." mean, we look
to the construction aids found in the Government Code. Section 311.006, Internal
References, provides:

In a code:


 a reference to a title, chapter, or section without further identification
is a reference to a title, chapter, or section of the code; and
 a reference to a subtitle, subchapter, subsection, subdivision,
paragraph, or other numbered or lettered unit without further
identification is a reference to a unit of the next larger unit of the code
in which the reference appears.



§ 311.006. Therefore, the reference to "This section. . ." at the beginning of section
11.02(c) of art. 4590i can only mean that the language that follows applies to the entirety
of section 11.02. Thus, we construe section 11.02(c) to preclude any application of section
11.02(a) in a manner that would limit the liability of an insurer in a subsequent "Stowers"
claim.

 However, as noted above, the Welch court concluded that our construction of
section 11.02 of art. 4590i would lead to an absurd result. Welch, 191 S.W.3d at 171. 
According to Welch, the absurd result would arise in situations where the physician is
unsuccessful in his "Stowers" action and would have to bear the entire burden of the
uncapped judgment. Id. For this possibility to be considered an absurd result, we must
assume that the legislature intended to abrogate the "Stowers" doctrine by enacting art.
4590i. In a typical "Stowers" action, an unsuccessful insured will always bear the entire
burden of the underlying judgment. By enacting the damage caps of section 11.02(a), the
legislature provided certain statutory protections to physicians and health care providers,
but expressly excepted successful health care liability claims "where facts exist that would
enable a party to invoke the 'Stowers Doctrine.'" Art. 4590i, § 11.02(c). Thus, before the
trial court may enter judgment in a medical liability case, it must determine whether facts
exist that would enable a party to invoke the "Stowers Doctrine."

 Our construction of section 11.02(c) is consistent with the purposes of the statute. 
See § 311.023(1). In section 1.02(b) of art. 4590i, the legislature provided that art. 4590i's
purpose was to improve and modify the health care liability claims system, but it was to "do
so in a manner that will not unduly restrict a claimant's rights any more than necessary to
deal with the crisis." Art. 4590i, § 1.02(b)(3).

 Additionally, the legislative history of art. 4590i shows that the legislature did not
intend to interfere with "Stowers" claims. Beginning with the debate before the House
State Affairs Committee, where the original H.B. 1048 (7) was being considered, there was
discussion of the "Stowers Doctrine" and the use of the doctrine to ensure that a
physician's insurance carrier bargained in good faith. During a general discussion of
negotiations and bargaining in good faith after the filing of a medical liability claim, Rep.
Henderson said:

What she's talking about-members, those of you that are not attorneys, we
have an old theory in law that's called the Stowers Doctrine. And what it
says is, is that if you do not bargain in good faith-and this is kind of a loose
term-a loose definition-but this is the essence of it-if you don't bargain in
good faith, you try to hide the ball, then you're-then you have no limits on
your liability. So the Stowers Doctrine is in here, and this will be an incentive
for all parties to participate in good faith. And this kind of answers, I think,
what you're talking about, Mr. Hoestenbach. 


Texas Medical Liability & Insurance Improvement Act: Hearings on H.B. 1048 before the
House Comm. on State Affairs, 65th Leg. (March 14, 1977) (statement of Rep. Henderson).
Subsequently, during floor debate on the bill, Rep. Powers made the following statements:

Also, in paragraph (b)1, the original committee substitute or bill has a section
dealing with the Stowers Doctrine which, as many of you know, is an
insurance leverage negotiation device. Frankly, it deals with the demands
for settlement within policy limits and that's the name of a San Antonio
Furniture Company that invoked the doctrine in that it imposes a certain
degree of liability. That liability goes to the insurance company or insuror
and not the physician, doctor, health care provider and so, in this
amendment, we simply change the language to reflect that. That that is what
the Stowers Doctrine does. It runs to the insuror. They are liable if they fail
to settle within those policy limits. That is simply a clean-up type of
amendment. We didn't alter the committee concept on the Stowers Doctrine.


Debate on H.B. 1048 on the Floor of the House, 65th Leg. (second reading) (March 22,
1977). The "liability" that Rep. Powers was referring to was the original draft of H.B. 1048
that would have allowed the filing of a "Stowers" claim directly against a doctor or health
care provider. In an attempt to remove any ambiguity related to the initial "Stowers"
provision, Mr. Ace Pickens, the representative of the Texas Medical Association, testified:

There is one thing that I hope you will consider and that is a section in the bill
that relates to the Stowers doctrine of which I am sure you are familiar with. 
It's always been my understanding that the Stowers doctrine applied to
insurers and not to the defendants. I believe that they have perhaps created
another cause of action in this bill because they made the so-called Stowers
Doctrine apply to insurer, physician, or health care provider, and I would
hope that you would take out the word physician or health care provider and
just leave the Stowers doctrine applying to the insurance company where it
always has been heretofore.


Texas Medical Liability & Insurance Improvement Act: Hearings on H.B. 1048 before the
Senate Comm. on Jurisprudence, 65th Leg. (March 30, 1977). Later, during discussions
on the floor of the Senate about limits on liability, (8) Sen. Farabee stated: 

In addition, there's a provision in here for a Stowers doctrine to apply that if
the insurance company is negligent in not settling within that $100,000, then
they can be liable for $300,000 if the jury finds that. So, we tried to retain all
those things that would contribute to settlement, . . . .


Debate on H.B. 1048 on the Floor of the Senate, 65th Leg. (April 17, 1977). Ultimately, the
bill that was passed removed the "doctor or health care provider" language from section
11.02(c). Art. 4590i, § 11.02(c). However, our review of the legislative history of H.B. 1048
reveals a consistent intent by the legislature to provide liability protection for doctors and
health care providers without limiting an insurer's liability in a "Stowers" claim. 

 From the excerpted portions of the legislative history, we ascertain that the
legislature intended for the "Stowers Doctrine" to retain its common law form. This intent
is most evident in the discussion of how the "Stowers Doctrine" encourages insurers to
bargain in good faith during the negotiation phase of a medical malpractice case.
Accordingly, we conclude that the legislative history of art. 4590i supports our construction
of section 11.02 as not limiting the liability of an insurer against whom a "Stowers" claim
could be invoked. 

 Next, we are mindful of former Chief Justice Phillips's dissenting opinion in Lucas
v. U.S., 757 S.W.2d 687 (Tex. 1988), wherein Chief Justice Phillips discussed why he felt
art. 4590i was constitutional. In discussing the criticisms made by the majority that the
legislature passed art. 4590i as a speculative experiment, Chief Justice Phillips observed:

Far from engaging in undisciplined speculation, the Legislature attempted in
this instance to meet a complex social problem by limiting damages "in a
manner that will not unduly restrict a claimant's rights any more than
necessary to deal with the crisis." Tex. Rev. Civ. Stat. art. 4590i, §
1.02(a)(3). The exclusion of all medical damages from the limits, the inflation
adjustment provisions, the limitation on a per defendant rather a per
occurrence basis, and the exclusion of Stowers claims from the limits all
indicate a legislative solicitude for the injured claimants.


Id. at 720 (emphasis added).

 Finally, Phillips contends that, even if this court finds that section 11.02(c) of art.
4590i applies, the proof provided by Bramlett was not sufficient to trigger an invocation of
the "Stowers Doctrine." Phillips then admits that the first two elements of a "Stowers" claim
were provided to the trial court, but asserts that Bramlett failed to produce evidence on the
third element, that the terms of the demand are such that an ordinary and prudent insurer
would accept it, considering the likelihood and degree of the insured's potential exposure
to an excess judgment. The jury has spoken to the third issue by its verdict and findings
that led to the judgment of which Phillips is now complaining. The proof was sufficient to
permit the trial court to "find that facts exist that would enable a party to invoke the
common law theory of recovery commonly known in Texas as the 'Stowers Doctrine.'" Art.
4590i, § 11.02(c). 

 Because the trial court found that the present case presented facts which would
allow the invocation of a "Stowers" claim and because we construe art. 4590i, section
11.02(c), as making the damages cap of section 11.02(a) inapplicable in that event, we
conclude that the trial court did not err in refusing to apply the damage caps to the
judgment rendered.

Legal and Factual Sufficiency of Evidence of Gross Negligence


 Phillips next contends that the evidence was neither legally nor factually sufficient
to support the jury's finding of gross negligence. When both legal and factual insufficiency
are alleged, we should address the issue of legal insufficiency first. Glover, 619 S.W.2d
at 401. 

 To recover exemplary damages, Bramlett was required to prove that Phillips acted
grossly negligent by clear and convincing evidence. Tex. Civ. Prac. & Rem. Code Ann. §
41.003(a) (Vernon Supp. 2006). To meet the clear and convincing standard, Bramlett was
required to present evidence sufficient to produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be established. Id. at §
41.001(2). Because the standard of proof for gross negligence is higher than that for
traditional negligence, so too, the standard of review will be heightened. City of Keller, 168
S.W.3d at 817 (citing Sw. Bell Tel. Co. v. Garza, 164 S.W.3d 607, 627 (Tex. 2004)). The
requirement for a heightened standard of review means that we must review all of the
evidence, not just the evidence favorable to the verdict, and may not disregard evidence
contrary to the verdict. City of Keller, 168 S.W.3d at 817. 

 As previously stated, to recover exemplary damages, Bramlett had to prove by clear
and convincing evidence that Phillips acted grossly negligent. Gross negligence is defined
as "an act or omission: (A) which when viewed objectively from the standpoint of the actor
at the time of its occurrence involves an extreme degree of risk, considering the probability
and magnitude of the potential harm to others; and (B) of which the actor has actual,
subjective awareness of the risk involved, but nevertheless proceeds with conscious
indifference to the rights, safety, or welfare of others." Tex. Civ. Prac. & Rem. Code Ann.
§ 41.001(11) (Vernon Supp. 2006). The two parts of the definition of gross negligence are
described as the objective test and the subjective test respectively. Lee Lewis Const., Inc.
v. Harrison, 70 S.W.3d 778, 785 (Tex. 2001). Setting aside the objective test for the
moment, we will focus our inquiry on the subjective test.

 The second element of gross negligence, the subjective test, requires proof that
Phillips had actual awareness of Vicki's peril, but, by his actions, demonstrated that he did
not care. Id. at 787. Within the context of the allegations and proof, Bramlett alleged that,
when Phillips left the hospital at approximately 7:16 p.m., he had actual awareness of
Vicki's condition and, by leaving, demonstrated conscious indifference to her plight. 
However, the evidence shows only that Phillips had ordered the H&H test and fluid
challenge at approximately 5:30 p.m., but had not received the results of these tests. The
last time Phillips had received information regarding Vicki's condition, the nurses at the
hospital had reported that Vicki's vital signs were stable but that she had low urine output. 
The cause of Vicki's low urine output was hotly contested during the trial, however, the
evidence established that it could have been the result of either dehydration or internal
bleeding. Although Phillips testified that a possible concern for internal bleeding along with
dehydration lead him to order the H&H test and Fluid Challenge, there is no evidence that
suggests that Phillips had actual knowledge that Vicki was bleeding when he left the
hospital. Because it is the actual awareness of Phillips that is the test, what he should
have known is not the controlling inquiry. Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 25
(Tex. 1994). Bramlett contends that, because Phillips knew internal bleeding was a
"significant" risk of the surgery, there was an urgency in finding out what was causing the
low urine output. Additionally, Bramlett contends that Vicki displayed "classic symptoms"
of internal bleeding that Phillips must have recognized, but chose to ignore. The problem
with this analysis is that it assumes that Phillips should have put all of these signs together
and concluded that Vicki was actually bleeding to death internally. There is no evidence
in the record that proves that Phillips did put these signs together and, as a result, was
actually aware that Vicki was bleeding internally. Tex. Civ. Prac. & Rem. Code Ann. §
41.001(11) (Vernon Supp. 2006), Transp. Ins. Co., 879 S.W.2d at 25. Without proving
Phillips's actual awareness of the risks involved, there can be no proof that the actions of
Phillips were taken in conscious indifference to the welfare of Vicki. Tex. Civ. Prac. & Rem.
Code Ann. § 41.001(11) (Vernon Supp. 2006). It is this actual awareness of the risks that
demonstrates the state of mind of the actor that separates gross negligence from ordinary
negligence. Diamond Shamrock Ref. Co. v. Hall, 168 S.W.3d 164, 173 (Tex. 2005). (9) In
the present case, there is not legally sufficient evidence to demonstrate, clearly and
convincingly, that Phillips had actual awareness of the danger Vicki was in but chose to
consciously disregard the risk by leaving the hospital. Accordingly, we find the evidence
legally insufficient to sustain the jury's finding of gross negligence against Phillips. Having
disposed of the issue under the subjective test, we need not address the sufficiency of the
evidence regarding the objective portion of the test for gross negligence. See Tex. R. App.
P. 47.1.

 Having determined that the evidence was legally insufficient to support the jury's
finding of gross negligence, we reverse that portion of the judgment. 





Conclusion


 We reverse and render a take-nothing judgment in favor of Phillips on the issue of
gross negligence. We suggest a remittitur in the amount of $220,000 as to both Shane
and Michael on the issue of future pecuniary loss. If within 30 days of the date of this
opinion, Shane and Michael make a remittitur of that amount, our judgment reforming the
trial court's judgment to reduce Shane and Michael's damages in the sum of $220,000 will
issue. If Shane and Michael do not accept the remittitur, we will reverse the trial court
judgment, except that portion herein rendered, and remand the cause for a new trial. Tex.
R. App. P. 46.3 If remittitur is made as suggested above, the judgment of the trial court
will be reformed to so reflect. In all other respects, we affirm the judgment of the trial court.

 

 Mackey K. Hancock

 Justice




Campbell, J., dissenting.

Reavis, S.J., concurs in result only.
1. Don H. Reavis, Justice (Ret.), seventh Court of Appeals, sitting by assignment.
2. Act of June 16, 1977, 65th Leg., R.S., ch. 817, § 11.02, 1977 Tex. Gen. Laws 2039,
2052. Article 4590i was repealed by Act of June 2003, 78th Leg., R.S., ch. 204, § 10.09,
2003 Tex. Gen. Laws 847, 884. As Bramlett's medical malpractice suit was filed on May
27, 2003, prior to the repeal of article 4590i, we must apply the provisions of that article. 
Further reference to specific provisions of Tex. Rev. Civ. Stat. Ann. art. 4590i will be by
reference to "art. 4590i, § __."
3. These amounts do not equal 75 percent of the jury's findings but rather the
calculation of damages after deductions for settlement credit plus prejudgment interest less
deduction for settlement offer. The total calculations are not contested by either party. 
4. Dr. Hemsell's qualifications and expertise were never challenged by Phillips.
5. Neither party inquired into Phillips's knowledge of whether a patient had bled to
death from a laproscopic-assisted vaginal hysterectomy.
6. Further references to Texas Government Code provisions will be by reference to
"§ __."
7. H.B. 1048, when enacted, became art. 4590i.
8. At the time of Sen. Farabee's statement, the proposed caps were for an overall cap
of $500,000, with a specific non-economic damages cap of $100,000.
9. We note that the experts testified that this was the only case they had ever heard
of where a patient bled to death after a laproscopic-assisted vaginal hysterectomy. This
evidence further convinces us that the proof of Phillips's actual awareness of Vicki's peril
was legally insufficient to show that Phillips acted grossly negligent.